# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 23-1748V

|  |  |
|---|---|
| ANN MALONEY,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: October 8, 2025 |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Eleanor Hanson*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On October 5, 2023, Ann Maloney filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she sustained a shoulder injury related to vaccine administration ("SIRVA") due to an influenza ("flu") vaccine received on September 22, 2022. Petition (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**For the following reasons, I find that Petitioner has established past pain and suffering warranting an award of $120,000.00**.

## I. Procedural History

Respondent conceded entitlement for a Table SIRVA in July 2024, but the parties reported an impasse on the appropriate award for past (actual) pain and suffering damages just two months later (ECF Nos. 19, 25). The parties therefore briefed their respective positions. Brief filed Dec. 2, 2024 (ECF No. 29) (seeking $160,000.00 for past pain and suffering); Response filed Jan. 31, 2025 (ECF No. 30) (viewing Petitioner's request as "excessive" and recommending a lower award "consistent with previous milder surgery cases"); Reply filed Feb. 18, 2025 (ECF No. 31). The matter is now ripe for adjudication.

## II. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## III. Evidence[4]

Upon receiving the flu vaccine in her left arm on September 22, 2022 (Ex. 3 at 230), Petitioner was 45 years old and generally healthy. She had no recent history of left

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as all arguments presented by both parties.

shoulder/arm pain or dysfunction. But fifteen (15) years earlier in 2007, she had a metal plate placed for a left humerus fracture. Response at 2, citing Ex. 3 at 249.

Petitioner first documented her SIRVA eleven days later, on October 3, 2022, via telephone call to her primary care practice. Ex. 2 at 151. She reported that after her vaccination, she "couldn't move [her] arm for 4 days." *Id.* The arm/shoulder remained "very painful to move and [was] keeping her up at night." *Id.* The following day, a triage nurse returned the call, recording that Petitioner "was using some tylenol/ibuprofen which helped but [she] does not prefer to take them" and her current pain rating was 7/10. *Id.* at 152. The triage nurse recommended in-person evaluation of the shoulder injury. *Id.*

On October 6, 2022, a primary care physician ("PCP") recorded Petitioner's history of a post-vaccination injury with inability to move the arm for four days, and ongoing pain currently rated 8/10. Ex. 3 at 249. Petitioner reported that ibuprofen and acetaminophen had "dulled the pain but did not take it away," and she did not like to take medication. *Id.* Heat had not helped. *Id.* The PCP's physical examination found full active ROM at the shoulder "but slow getting there because of pain"; Speed's and impingement tests were negative. *Id.* Petitioner was noted to be very active and a practitioner of yoga, and she opted to continue working independently on her ROM rather than accepting a referral to formal physical therapy ("PT") at that time. *Id.* at 249 – 50. An x-ray of Petitioner's left shoulder found: "ORIF hardware of the healed left humerus fracture [from 2007] is intact. No radiographic evidence of hardware complications. Minimal acromioclavicular osteoarthritis." *Id.* at 252.

At an October 27, 2022 initial evaluation with an orthopedic surgeon, Petitioner reported a substantially similar history – including that after her flu shot, her left shoulder had become "unusable." Ex. 4 at 25. The physical exam found decreased ROM (specifically 60 degrees forward flexion),[5] weakness (3–4/5), and a positive Hawkins sign. *Id.* at 27. The orthopedist diagnosed "left post vaccine subacromial bursitis with weakness," for which he prescribed a Medrol dose pack (methylprednisolone, a steroid). *Id.*

A November 2, 2022, MRI of Petitioner's left shoulder yielded the following impressions: "1. Bursal surface fraying and likely poorly defined partial-thickness bursal surface and intrasubstance tearing of the distal supraspinatus tendon anteriorly, low to intermediate-grade. 2. No high-grade or full thickness rotator cuff tendon tear. 3. Mild

---

[5] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, *Measurement of Joint Motion: A Guide to Goniometry* 72, 80, 88 (F. A. Davis Co., 5th ed. 2016).

subacromial-subdeltoid bursitis. 4. Small glenohumeral joint effusion. 5. Metallic artifact from fixation hardware in the proximal humerus." Ex. 4 at 47.

At a November 3, 2022 orthopedics follow-up, Petitioner reported that she had not taken the oral steroids, in favor of "Advil and stretching on her own." Ex. 4 at 53. The orthopedist discussed his understanding of the potential for vaccine injuries "most notably with thin body habitus if a needle is misplaced." *Id.* at 54. The orthopedist opined that the lack of full-thickness tearing on Petitioner's MRI was "promising," but the her inflammation and pain justified a subacromial steroid injection which was administered during that appointment. *Id.* The injection was associated with 40% relief initially. *Id.*

At her orthopedist's direction, on November 11, 2022, Petitioner attended a physical therapy ("PT") initial evaluation. Ex. 4 at 67. She reported left shoulder pain with an "Initial flare up after [the recent steroid injection] but then got better. 50% improvement since pain started," *Id.* The pain ranged from 0-6/10. *Id.* at 69. Petitioner also indicated that the pain was worst, and "still noticeable," at night – but she was apparently sleeping with "minimal pain, 7 hours of sleep." *Id.* at 68 – 69. An exam found painful, limited active ROM (100 degrees flexion, 120 degrees abduction, and 80 degrees external rotation) but full passive ROM. *Id.* at 70 – 71. Weakness was not found. *Id.* The therapist assessed "signs and symptoms consistent with L shoulder pain and high severity and moderate irritability… Limited shoulder [ROM] secondary to pain but none passively…" *Id.* at 72. The therapist and Petitioner planned a course of 4-6 biweekly sessions, with goals of achieving independence with a home exercise program, full active range of motion, and decreased pain levels. *Id.*

Petitioner continued home exercises between additional formal PT sessions occurring on December 16, 2022, January 24, and March 21, 2023. Ex. 4 at 87 – 119. She initially reported improvement, but in March 2023, she raised concern for an "aggravation" of her injury and rated 5-7/10 pain. *Id.* at 110. Taking particular note of Petitioner's "painful arc between 90 and 120 degrees that worsen[ed] with eccentric lowering," the therapist offered modifications to the home exercise program, and recommended additional formal sessions, *Id.* at 112 (which did not occur).

On May 3, 2023, a second orthopedic surgeon reviewed Petitioner's treatment course and her current complaints of: "[M]oderate to severe pain throughout the day… unable to perform any shoulder ROM comfortably… affecting her ADLs and home life… She tries not to use her left upper extremity and has to perform activities through right hand… [C]onsistent ache within the shoulder that is frequently worse at night. The pain does wake her up in the middle of the night while she is sleeping." Ex. 5 at 33. Petitioner explained that she did not like to take over-the-counter pain medications and she had

4

noticed a "recurrence of her symptoms" despite PT and a steroid injection. *Id.* A physical exam was not recorded. Instead, Petitioner's two treating orthopedists conferred about her case and "surgical options for… HWR and arthroplasty." *Id.*

In a May 10, 2023 follow-up telephone appointment, Petitioner was informed that the orthopedists were "in agreement with the rationale behind removal of the humeral plate and a limited acromioplasty." Ex. 5 at 47. Specifically: "[B]ecause of her aggressive tendinopathy induced by the shot, the pain has led to a lack of use of the left shoulder which has led to rotator cuff weakness which leads to impingement syndrome of the left shoulder. This has been recalcitrant to physical therapy which she can hardly perform because of the pain… The purpose behind the plate removal and the acromioplasty is simply to create more space for the rotator cuff to glide. In this way, it made sense to the patient that despite having a painless piece of hardware in her arm and shoulder for all these years, it is part of a solution to prevent impingement…. This would be an outpatient surgery, [s]he could go home the same day, [s]he will be in a sling after surgery, limiting motion and activity for the [first] 2 weeks. After that she will be allowed to progress her motion function strengthening and therapy as directed by her symptoms. She understands that no surgery is associated with 100% resolution of symptoms… but wishes to proceed in light of potential benefits." *Id.*

On July 11, 2023, Petitioner underwent surgery under general anesthesia. A left shoulder open acromioplasty[6] was performed, and removal of the deep hardware from the humerus occurred. Ex. 6 at 134-36. After surgery, Petitioner was discharged home with a sling to wear for several weeks, and a limited prescription for oxycodone (an opioid pain medication). *Id.* at 137, 144.

On August 2, 2023, an orthopedics physician's assistant ("PA") recorded that Petitioner was no longer taking narcotic pain medication. Ex. 10 at 38. She had stopped wearing the shoulder sling due to *elbow* pain rated 5/10, which she was self-managing with ROM exercises. *Id.* A physical exam found "no acute neuromuscular deficit." *Id.* The PA assessed that Petitioner was doing well and progressing in her recovery, and she could follow up in one month. *Id.* at 39, 41.

At a September 13, 2023 post-operative PT initial evaluation, Petitioner reported shoulder pain associated with reaching overhead, abduction, and at night. Ex. 9 at 33. She rated the pain at 4.5/10. *Id.* On exam, active ROM was painful with 125 degrees

---

[6] Acromioplasty is defined as "surgical removal of an anterior spur of the acromion to relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint." Dorland's Med. Dictionary Online (hereinafter "Dorland's"), *Acromioplasty*, https://www.dorlandsonline.com/dorland/definition?id=710&searchterm=acromioplasty (last accessed Oct. 6, 2025).

5

flexion, 95 degrees abduction, and 70 degrees external rotation. *Id.* at 34. Passive ROM was closer to normal with 165 degrees flexion and 90 degrees external rotation. *Id.* The shoulder was also weak (ranging 3+-5/5). *Id.* The therapist assessed: "These deficits make it difficult for [Petitioner] to put objects away in a top cupboard, sleep, and perform recreational activities including yoga and rock climbing. [Petitioner] elect[ed] to work on her HEP at home and follow up if needed…" *Id.* at 36. The September 2023 reflects an authorization for four additional formal PT sessions, *id.*, which apparently did not occur.

There is a ten-month gap in the medical record documentation of Petitioner's shoulder before July 31, 2024, when Petitioner followed up again with the same orthopedics PA. Ex. 12 at 9. Petitioner reported that "overall, she did have some improvement from the surgery, however, still having pain and weakness in her left shoulder. She ha[d] been very diligent about performing her physical therapy exercises and is frustrated with the continued pain… and weakness with any overhead lifting. Pain is rated 6/10. Pain is intermittent, moderate, aching, and does wake her up at night. She overall feels approximately 25% improved since her last surgery…" *Id.* Petitioner also reported taking over-the-counter anti-inflammatory medications. *Id.* at 10. A physical exam did not address shoulder ROM, but it found positive Jobe's and Speed's tests, and weakness. *Id.* at 9 – 10. The PA tentatively assessed rotator cuff pathology, questioning whether the previously visualized tearing might have progressed. *Id.* at 10.

On August 7, 2024, a repeat MRI of Petitioner's shoulder found: "1. Supraspinatus and infraspinatus tendinopathy with low-grade partial-thickness tearing of the infraspinatus. No full-thickness rotator cuff tear or atrophy. 2. Mild subacromial/subdeltoid bursopathy. 3. Intact long head biceps tendon. 4. No displaced labral tear or para labral cyst." Ex. 12 at 29-30.[7]

The next day, upon meeting with another of her orthopedic treaters, Petitioner reported pain of 7/10 at rest, worsened with activity and at night. Ex. 11 at 2. Petitioner was managing the pain with home exercises. *Id.* The pre-surgery steroid injection had delivered "90% relief for only 1 week." *Id.* The exam recorded: "Range of motion: AROM (PROM). Shoulder: Forward elevation 170° (180°), abduction (90°), external rotation 45 (45), and internal rotation L1. *Id.* at 2. There was no crepitation or mechanical blocks to motion. *Id.* at 3.[8] The shoulder also had 4/5 strength, and a "positive O'Brien's, mildly relieved

---

[7] Petitioner's Brief at 12 provides that she underwent *three* MRIs. But the parties' briefing, and my own review of the underlying medical records, identified only two MRIs. Ex. 4 at 47; Ex. 12 at 29-30.

[8] Crepitation is defined as "the noise made by rubbing together the ends of a fractured bone." Dorland's, *Crepitation,* https://www.dorlandsonline.com/dorland/definition?id=11616&searchterm=crepitation (last accessed Oct. 6, 2025).

with supination."[9] *Id.* at 2 – 3. The orthopedist discussed that Petitioner's current MRI did not "[s]how rotator cuff tearing and does not light up in any way." *Id.* at 3. The orthopedist diagnosed left post-vaccine subacromial bursitis with weakness, for which he administered a (second) subacromial steroid injection. *Id.* The orthopedist also recommended pool therapy and further injections for pain. *Id.* No further medical records have been filed.

Petitioner addressed her SIRVA in affidavits prepared in November 2023 (Ex. 7) and November 2024 (Ex. 13). She describes that her pain, weakness, and stiffness has persisted over time despite surgery and other treatment efforts, including ongoing use of ibuprofen. As of November 2024: "Things [Petitioner] can no longer do, or can only do while experiencing pain, are cleaning/ scrubbing/ sweeping/ mopping, reaching in cupboards/ closets/ shelves, laundry, washing and blow-drying [her] hair, putting on and taking off shirts, raking leaves, shoveling snow, biking, rock climbing, canoeing/kayaking, holding babies and small children, yoga, basketball, tennis, push-ups, carrying grocery bags, driving, and sleeping soundly." Ex. 13 at ¶ 6. Petitioner feels "defeated" by concern that her shoulder injury will persist indefinitely, adding that her second steroid injection had worn off within three months. *Id.* at ¶ 4. Of note, Petitioner is a full-time stay-at-home mother of five children (her husband is a teacher). Ex. 7 at ¶ 4; Ex. 13 at ¶ 5. Medical records corroborate this – but also reveal that her children are older. *See, e.g.*, Ex. 3 at 33, 110 (reflecting that one child had moved away for college, and her five children ranged in age from 10 – 21 years old in September 2022, when she sustained her SIRVA).

### IV.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

---

[9] In an O'Brien test, a medical provider asks a patient to raise his or her arms to 90 degrees (parallel to the floor) with elbows fully extended; bring arms towards the center of the body slightly (10 to 15 degrees); and rotate arms inward. The top of the patient's hands will face toward each other, and thumbs will point down. This is called pronation. The medical provider then presses down on the patient's arms and asks him or her to resist the pressure and push the arms upward.

Next, the healthcare provider asks the patient to rotate his or her arms the other way. The patient's palms will face the ceiling, and elbows will face the floor. This is called supination. Again, the healthcare provider presses down on the patient's arms and asks him or her to resist.

A positive O'Brien test means that a patient has pain in the first position but less pain in the second position. The O'Brien test helps to assess shoulder pain and its potential etiology, specifically labral tear or acromioclavicular joint problem. *See* Cleveland Clinic, *O'Brien Test*, https://my.clevelandclinic.org/health/diagnostics/22609-o-brien-test (last accessed Oct. 6, 2025).

7

I have reviewed the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

I find that Petitioner should receive an above-average pain and suffering award, given her pursuit of medical evaluation and treatment beginning just eleven days after the vaccination, followed by high pain ratings; ROM deficits; and fairly consistent treatment efforts including MRI, a steroid injection, (very limited) formal and informal PT, surgical intervention, a limited course of opioid pain medications, and follow-up appointments running to about the one-year mark.

But Petitioner's request for $160,000.00, relying on comparison to the *Reed* and *Monson* cases,[10] is too high. As Respondent notes, the *Reed* and *Monson* petitioners suffered a moderately severe SIRVAs persisting for multiple years, without treatment gaps. Additionally, the *Reed* petitioner continued to take the prescription medication Tramadol daily and was consulting a pain management specialist. Response at 9 – 10.

In contrast, this case has been submitted for adjudication based on medical record evidence spanning less than two years. The bulk of formal treatment occurred within the first year post-vaccination. At that juncture, Petitioner had objective ROM limitations and high pain ratings – but she also discontinued formal treatment. Even accepting her explanation that she continued a home exercise program and self-managed her condition for the next ten months, that resulted in an evidentiary gap, and it also permits a conclusion that her injury was less severe. Petitioner has not identified any particular barriers to accessing medical treatment, or furnished any supporting witness testimony or other non-medical evidence that might bolster her claim of ongoing limitations throughout this period. And while there is some medical record evidence of an ongoing shoulder injury – justifying a second steroid injection, the orthopedic surgeon was equivocal in his opinion – commenting that his exam did not find any "mechanical blocks" to ROM (e.g., adhesive capsulitis) or any rotator cuff tearing or anything else "light[ing] up" on the repeat MRI. Ex. 11 at 2 – 3. Based on the record before me, it is difficult to accept that Petitioner's SIRVA lasted beyond the first year of treatment (or that it is necessarily permanent), despite the intrusive treatment received.

---

[10] Citing *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for past pain and suffering); *Monson v. Sec'y of Health & Hum. Servs.*, No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Mar. 15, 2023) ($155,000.00)

Petitioner cannot "quit or change" her role as a stay-at-home mother, Reply at 7. *But* when she sustained her SIRVA, her children were 10 years old and up. *See* Ex. 3 at 33, 110. I recognize that within a two-parent household, the primary caregiver and homemaker may become responsible for a greater portion of household responsibilities – but that is distinct from having to physically care for children that are very young, or otherwise not independent.[11]

At the same time, Respondent's briefing is rather incomplete.[12] He has not recommended a specific figure – even though the case is formally in damages, and he presented a proffer to Petitioner during their (unsuccessful) efforts to informally resolve damages. *See* Status Report (ECF No. 21) (providing that Respondent had communicated a counteroffer to Petitioner). Once briefing is ordered in a case, each party is expected to propose a specific figure for pain and suffering (and any other disputed damages component) and seek to defend it. It is less persuasive to withhold a specific number and cite to eight past cases (with awards ranging from $95,000.00 - $110,000.00) without direct, head-to-head comparison. Response at 8 – 9. From my review, three of Respondent's cases (*Shields*, *Shelton*, and *Crawford*) are poor fits for involving significantly longer initial treatment delays, which suggest less severe initial pain.

Of Respondent's remaining cases, *Felland*[13] is instructive – reflecting a similarly conservative treatment course consisting of over-the-counter pain medications, steroid injections, and home exercises for roughly eight months prior to undergoing surgery. After post-surgical PT concluding roughly one year post-vaccination, that petitioner ended formal treatment and his SIRVA was found to be substantially resolved.[14] Petitioner's

---

[11] *See, e.g.*, *Carlow v. Sec'y of Health & Hum. Servs.*, No. 19-1449V, 2022 WL 3335592 (Fed. Cl. Spec. Mstr. July 12, 2022) and *Desrosiers v. Sec'y of Health & Hum. Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (recognizing impacts on pregnancies and care of newborn children); *Reed*, 2019 WL 1222925 and *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (involving young children diagnosed with autism).

[12] Respondent has again stated: "The Court has awarded between *$91,000.00* - $110,000.00 in cases requiring surgeries, particularly where pain is not always immediately reported or there is a gap in treatment." Response at 8 (emphasis added). That is likely incorrect and should say *$95,000.00*. *See Chukwudum v. Sec'y of Health & Hum. Servs.*, No. 20-0936V, 2025 WL 1167020, at *4 (Fed. Cl. Spec. Mstr. Mar. 17, 2025) (reviewing similar briefing from Respondent).

[13] *Felland v. Sec'y of Health & Hum. Servs.*, No. 20-0406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for past pain and suffering).

[14] The *Felland* opinion did not accept that Petitioner's additional shoulder complaints after a nine-month treatment gap were attributable to his SIRVA, as opposed to recent exercise. 2022 WL 10724100, at *7. As noted above, this case's evidence does not identify a specific potential alternative cause for Petitioner's subsequent shoulder complaints – but there is also an evidentiary gap and the treating orthopedist was equivocal in his opinion.

single post-surgical PT appointment and nearly year-long treatment gap suggests a similar improvement. However, because of Petitioner's earlier start of treatment (eleven days, rather than 34 days) higher pain ratings, and Respondent's lack of a specific valuation for the case, she will be awarded more – $120,000.00 for past pain and suffering.[15]

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **Petitioner is entitled to damages in the form of $120,654.41 (representing $120,000.00 for past pain and suffering, and $654.41 for past unreimbursed medical expenses[16]) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] The parties stipulated to the past expenses. Brief at 1; Response at n. 1.

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.